IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUAN JAVIER RIVERA and JOSE PABLO LEMUS, individually and on behalf of others similarly situated,<br><br>                               Plaintiffs,<br><br><br>          v.<br><br><br>THE BRICKMAN GROUP, Ltd.,<br>                               Defendant. | Civ. No. 05-1518 |

OPINION

Pollak, J.                                                          January 7, 2008

Presently before the court are the parties' cross-motions for partial summary

judgment (Docket Nos. 136 & 137) on plaintiffs' claim under the Fair Labor Standards

Act ("FLSA") of 1938, 29 U.S.C. §§ 201–19.

I.      **Procedural history**

Rivera and the other plaintiffs are citizens of Guatemala and Mexico who worked

as seasonal landscapers for defendant the Brickman Group between 2003 and 2005.

Brickman petitioned for and was granted temporary work visas for the plaintiffs under 8

U.S.C. § 1101(a)(15)(H)(ii)(b) and 8 C.F.R. § 214.2(h)(6).  That program (commonly

known as the "H-2B program") allows U.S. employers to petition the Department of

-1-

Labor for permission to employ non-agricultural foreign workers for periods of less than one year.[1]

Though plaintiffs' cash wages appeared to comply with all applicable laws, plaintiffs claim that Brickman forced them to pay for employment-related costs out-of-pocket. These costs, they contend, operated as *de facto* deductions that reduced their real wages below the applicable minimum wage. They translate this basic allegation into four causes of action: (1) an FLSA violation, (2) a Pennsylvania Wage Payment and Collection Law ("PWPCL") violation, (3) common law breach of contract, and (4) common law wrongful termination.

After some discovery and on plaintiffs' motion, Magistrate Judge M. Faith Angell recommended that the case be certified as a collective action under 29 U.S.C. § 216(b). I adopted that recommendation, and, following a six-month opt-in period, the plaintiff class grew to 101 persons.[2]

Merits discovery is complete, and, in accordance with Judge Angell's scheduling order, the parties have cross-moved for partial summary judgment on the FLSA claim.

---

[1] The Immigration and Nationality Act ("INA") provides for five classes of temporary work visas: H-1B (for workers with specific skills), H-1C (for registered nurses), H-2A (for agricultural workers), H-2B (for unskilled non-agricultural workers), H-3 (for trainees with no intention of remaining in the United States once their course of training is complete). *See* 8 U.S.C. § 1101(a)(15)(H).

[2] The final number is apparently disputed, as Brickman claims that some of the opt-ins never worked for it. I leave it to the parties, for now, to determine whether they can agree on the final class membership.

-2-

Oral argument was held on November 13, 2007, and the motion is now ripe for disposition.

## II.    Undisputed facts

The basic facts are not in dispute.  Brickman employed plaintiffs to perform seasonal landscaping services between 2003 and 2005.[3]  Plaintiffs were paid cash wages that, on their face, exceeded both the FLSA minima and the higher H-2B minima. Plaintiffs were responsible for their own transportation between their home countries and the Brickman worksites.  In addition, they were responsible for the costs of securing passports and work visas, as well as any fees charged by the workers' representatives that assisted them in completing the necessary paperwork.  It is undisputed that these costs, if considered primarily for Brickman's benefit, reduced wages below the FLSA minimum.

The hiring process generally worked as follows: Brickman retained recruiting agencies to work on its behalf in Mexico and Guatemala and gave those recruiters the authority to offer prospective employees seasonal jobs.  In each country, Brickman's recruiting agency performed its task by working with a company representing workers looking for jobs in the United States.  Brickman's agency designated this workers' representative as the only entity authorized to present H-2B applicants to the United States Consulate in the relevant country.  Rather than depending on the workers' representative to find workers, however, Brickman hired only returning workers and

---

[3] Brickman hired workers one season at a time.  Working for Brickman one season did not guarantee employment the next, though most of Brickman's labor force was comprised of returning workers.  Seasons lasted up to ten and one-half months.

persons referred to it by returning workers.  The returning workers were directed to contact the designated workers' representative before the beginning of the season in order to secure Brickam employment.

## III.    Legal standard

A party should be awarded summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Here, the parties agree that, with respect to plaintiff's FLSA claim, the material facts are not disputed, and they request a ruling on the disputed questions of law.

## IV.    Analysis

This section proceeds in three parts.  First, I address Brickman's argument that the Immigration and Nationality Act ("INA") is the exclusive regulator of when employers must pay guest workers' point-of-hire transportation costs.  Second, I consider Brickman's argument that the Portal-to-Portal Act prevents the FLSA from affecting any of the costs at issue.  Finally, having determined that neither the INA nor the Portal-to-Portal Act is relevant here, I apply the Department of Labor's primarily-for-the-benefit-of-the-employer test to each of the costs at issue.

### A.    The impact of (a) the Immigration and Nationality Act and (b) the administrative stance of the Department of Labor

Brickman argues that the INA regulates when an employer is required to pay a foreign employees' travel costs, and that, in doing so, it supplants the FLSA.

-4-

Specifically, the INA provides:

> In the case of an alien who is provided nonimmigrant status under [*inter alia*, the H-2B program] and who is dismissed from employment by the employer before the end of the period of authorized admission, the employer shall be liable for the reasonable costs of return transportation of the alien abroad.

8 U.S.C. § 1184(c)(5)(A).  Invoking the textual canon of construction *expressio unius est exclusio alterius*, Brickman contends that, by providing for the employer to incur the cost of travel in one situation, Congress declined to require the employer to do so in others.[4]

Brickman also points to a Department of Labor regulation that deals with the wage rate that H-1B (agricultural workers) employers must pay under the INA.  To participate in the H-1B program, an employer must pay at least the prevailing wage rate for the work in the area in which it operates.  This figure is often higher than the FLSA minimum.  According to a Department of Labor regulation, for purposes of determining whether the employer pays the H-1B minimum, the cost of travel to and from an employee's home country is not deducted.[5]  20 C.F.R. § 655.731(c)(9)(iii)(C). This, according to Brickman,

---

[4] This argument appears relevant only to the issue of the workers' transportation costs, not to the visa-related costs, or to the fees charged by the designated workers' representatives.

[5] In determining whether an employer is paying a required minimum wage—be it the FLSA minimum or some other one, such as the H-1B minimum—it is common administrative practice to deduct from the cash wage any costs incident to employment that the employer has passed along to the employee.  This is done in order to prevent employers from avoiding the minimum by paying an appropriate cash wage, but requiring that employees kick-back some portion of that wage to the employer or to costs that support the employer (thus effectively pulling the wage below the minimum).  When an employer passes along a cost that the relevant statute disallows, for purposes of determining compliance with the minimum, the cost of the expense passed along is deducted from the cash wage.  Which costs may and may not be passed

signals that the Department has concluded that transportation costs from guest workers' home countries are not primarily for the benefit of the employer, and Brickman argues that this conclusion applies here even though the cited regulation addresses the H-1B program, not the H-2B program at issue here.

Brickman disputes that the FLSA, enacted in 1938, has ever affected who must pay point-of-hire transportation costs.[6]   But assuming *arguendo* that the FLSA at one time affected guest workers' transportation costs, Brickman's core contention here is that the INA, enacted in 1952, implicitly withdrew any FLSA impact on who must pay guest workers' transportation costs by comprehensively regulating the issue itself.  This argument has a number of flaws.  Most fundamentally, it sets up a false conflict between the INA and the FLSA.  The INA requires the employer to pay for travel back to the worker's home country  in the limited circumstance of the termination of an H-2B worker, and the requirement has application irrespective of the worker's wage rate, 8 U.S.C. § 1184(c)(5)(A).  In marked contrast, the FLSA, under plaintiff's argument, would require the employer to incur the costs at issue here under a very different set of circumstances—namely, when payment would be necessary to bring the employee's real wage above the FLSA minimum wage, 29 U.S.C. § 206 (setting out the minimum wage).  Thus, there is no direct conflict, and the *expressio* canon is inapt, because, in the INA, Congress did not speak to the issue of minimum wage; it merely required that

_____

along depends on the statute at issue.

    [6] This argument is addressed in Part IV.C.1, *infra*.

transportation costs back to the worker's home country be paid irrespective of wage and under the circumstance of the worker's being "dismissed from employment."  It would stretch the *expressio* canon far beyond its customary haunts to infer that Congress, in enacting a particular provision of the INA, meant, *sub slientio*, to repeal an aspect of the minimum wage law, enacted decades ago, addressed to situations very unlike those dealt with by the INA.[7]

This conclusion is underscored by the following considerations:

First, one of the oldest principles of judicial deference to the legislative branch is that one federal statute should not be read to repeal another implicitly unless the two statutes cannot reasonably be harmonized.  *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.,* 534 U.S. 124, 143-144 (2002); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 189–90 (1978); *Wood v. United States*, 41 U.S. 342, 363 (1842) (holding that a statute is only repealed by implication if there is a "positive repugnancy" between it and the new statute) (Story, J.).  In addition, under prevailing Supreme Court precedent, so long as an employer can comply with two overlapping labor statutes, it must do so, because labor

---

[7] The following language from the Supreme Court's opinion in *Chevron v. Echazabal*, 536 U.S. 73, 81 (2002), seems appropriate:

> Just as statutory language suggesting exclusiveness is missing, so is that essential extrastatutory ingredient of an expression—exclusion demonstration, the series of terms from which an omission bespeaks a negative implication.  The [*expressio*] canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which is abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded.

Here, the INA does not present a series of terms from which one might infer the exclusion of others.  It merely sets out one travel-cost requirement that presents no direct conflict with the one in the FLSA.

statutes are assumed to be mutually supplementary.  *Powell v. U.S. Cartridge Co.,* 339

U.S. 497, 518 (1950).  Indeed, under *Powell*, even when two labor statutes overlap

significantly, an employer must comply with both, unless doing so is not possible.[8]  *Id.*

Here, there is no question that an employer can simultaneously comply with both the INA

and the FLSA.

      Second, Rivera submits a 2001 letter from the Department of Labor to Senator

Warner which confirms that, in the agency's opinion, FLSA obligations constrain an

employer's behavior in the context of guest-worker transportation.   Ltr. from Asst. Sec'y

of Labor Kristine Iverson to Sen. John Warner, May 30, 2001 (hereinafter "Warner Ltr.")

("Let me first summarize the Department of Labor's existing policy with regard to

enforcing the general Fair Labor Standards Act (FLSA) interpretation on worker-incurred

transportation costs.  Employers are liable for worker-incurred transportation costs for

remotely hired workers from their point of hire to the employer's worksite.").  The

Department oversees multiple guest worker programs, and neither it nor any court has

advanced the position that those programs are relieved of FLSA compliance, by implied

repeal or otherwise.

      Third, the H-1B regulation that Brickman cites does not apply to the H-2B

---

[8] In *Powell*, the two statutes at issue, the Walsh-Healey Act and the FLSA, purported to set the minimum wage applicable to the plaintiff-employees at different levels.  Moreover, while the FLSA provided for overtime pay, the Walsh-Healey Act did not (though otherwise seeming to regulate defense employment in a comprehensive fashion).  Despite the near-complete overlap of the statutes on these points, the Court held them to be mutually supplementary, and thus held that the employer had to comply with both.  *Powell*, 339 U.S. at 516–22.

program, and thus cannot supplant the FLSA in this case.  Moreover, the regulation sets

up no conflict with the FLSA.  The regulation specifies certain deductions that an

employer can take from the required H-1B wage rate.[9]  It explicitly disallows taking

deductions from the H-1B wage rate for "business expenses," but then explains that "[f]or

purposes of this section," the costs of providing employees with travel to and from their

home countries "shall not be considered business expenses."  20 C.F.R.

§ 655.731(c)(9)(iii)(C).  In other words, deductions for employee transportation are

allowed.  This, according to Brickman, suggests that the Department of Labor does not

consider such expenses as "primarily for the benefit or convenience of the employer."

Brickman reads too much into the regulation.  Putting aside the fact that the regulation is

expressly self-limited, which might imply that its opposite is the norm, the regulation

creates no conflict with the FLSA.  It stipulates that the employer may take deductions

from the higher H1-B wage rate for providing point-of-hire transportation, while the

FLSA (under plaintiff's argument) would hold that the employer may not take such

deductions from its lower wage rate.  Such a result is not only harmonious, it may well be

a good compromise for ensuring that point-of-hire transportation costs do not knock real

wages down too far without forcing employers to reimburse them *in toto*.

The above analysis accords with that of the two courts that have addressed the

question.  In *Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1235 (11th Cir. 2002)

---

[9] The regulation provides that, while H-1B employers are generally required to pay a certain minimum wage rate, they may pay employees less in cash wages if they also pay for certain approved employee-related expenses.

(Kravitch, J.), the Eleventh Circuit held that a similar provision in the INA does not

preclude applying the FLSA to the H-2A guest worker program[10] on the grounds that the

statutes are not mutually exclusive.  Similarly, in *DeLuna-Guerrero v. N.C. Grower's*

*Ass'n*, 338 F. Supp. 2d 649, 663 (E.D.N.C. 2004), the court held the same, reasoning that

"[t]here is no indication that it is impossible to comply with both laws."  In fact, the INA

provision at issue in those cases required the employer to reimburse H-2A workers by the

time 50% of the work-contract period had elapsed.  The *Arriaga* and *DeLuna* courts ruled

that, under the FLSA, the employer must reimburse in the first pay period as much as is

necessary to bring the wage up to the FLSA minimum.  *Arriaga*, 305 F.3d at 1237;

*DeLuna*, 388 F. Supp. 2d at 657.  Thus, despite the substantial overlap of the INA and the

FLSA—much more overlap than is present here—those courts held that the employer

must comply with both statutes.

 *Amicus curiae* Professional Lawn Care Network ("PLANET") has filed a brief

detailing the history of guest-worker programs under the INA.  PLANET tells a story of

extensive legislative and administrative wrangling over whether, to what extent, and

when employers would be required to pay for workers' transportation costs.[11]  This

---

 [10] *See* note 11, *infra*, which details the history of Congress's creation of the H-2A
program.  The H-2A program applies only to agricultural guest workers.

 [11] PLANET tells a three-part story, involving the revision of H-2 regulations in 1966–67,
another revision in 1977–78, and the promulgation of new regulations 1987 to account for
Congress' 1986 splitting the H-2 program into the current H-2A and H-2B components.
 In the 1966–67 amendments, the Department of Labor required that the employers of
*agricultural* H-2 guest workers reimburse point-of-hire transportation once the worker completed
half of his employment period.  *See* 32 Fed. Reg. 4571 (Mar. 28, 1967) (setting out contours of

-10-

history, however, is a bit incomplete, and it would seem helpful to consider a more

comprehensive version.

The first iteration of the modern Immigration and Nationality Act included

provisions for admitting certain classes of people as "nonimmigrants," that is, people with

no intention of remaining in the United States permanently.  INA, ch. 477, §§ 101(a)(15),

214, 66 Stat. 163, 168, 189–90 (1952).  These classes included persons intending to

perform temporary labor who were (1) of exceptional skill, (2) planning to perform labor

for which suitable resident laborers could not be found, or (3) coming as industrial

trainees.  *Id.* § 101(a)(15)(H), 66 Stat. at 168.  The original statute left it to the Attorney

General to regulate the entry of these temporary workers.  *Id.* § 214, 66 Stat. at 189–90.

Soon after passage of the INA, in 1952, the then-Immigration and Nationality

---

transportation-payment requirement).  This altered the prior rule that provided that transportation costs had to be paid, but did not specify when.

In 1977–78, the Department undertook to revise the regulations applied to *agricultural* H-2 workers, and point-of-hire transportation was one of the contested issues.  Some parties suggested that the Department should expand the employer's obligation beyond transportation costs and require that employers reimburse the time spent traveling to and from the point of hire that exceeded 30 minutes each way.  43 Fed. Reg. 10308 (Mar. 10, 1978).  The Department, however, rejected this proposal, declaring the status quo was sufficient to protect American workers.  *Id.*  (The tenor of the Department's commentary accompanying the new regulation suggests that the primary constituency for the change were advocates of American labor who wanted to inflate the cost of guest-worker labor by giving employers additional obligations).

In 1986, Congress amended the INA to divide the H-2 guest-worker program into two separate programs, the H-2A program for agricultural workers, Pub. L. No. 99–603, § 301 (1986) (creating H-2A program), and leaving the original H-2 program (which became known from then on as the H-2B program) for non-agricultural workers.  Promulgating new regulations for the two programs, the Department of Labor imposed on H-2A employers the longstanding obligation to pay for transportation once 50% of the contract period was completed, but imposed no new requirements on H-2B employers.  Essentially, the 1986 amendment and regulations merely reflected that the Department of Labor had always (*i.e.*, dating back at least to the Bacero program in 1942) regulated agricultural and non-agricultural guest workers differently.

-11-

Service promulgated comprehensive regulations that provided for an application process

for admitting nonimmigrant temporary workers.  17 Fed. Reg. 11469, 11493–94 (Dec. 19,

1952) (setting forth final rule, then codified at 8 C.F.R. § 214h).  The regulations did not

distinguish among the three types of workers (H-1, H-2, and H-3),[12] nor did they

substantively regulate the terms of the guest workers' employment.  At this point, nothing

in the INA or its regulations undertook to address transportation costs.  This is not to say

that guest-worker transportation was completely unregulated.  The documents governing

the Bracero program, under which, starting back in World War II, guest workers from

Mexico were recruited to perform agricultural labor in the southwestern United States,

had provided that employers were required to pay point-of-hire transportation costs.  Law

of Jul. 12, 1951, ch. 223 § 502(2), 65 Stat. 119, 120 (1951).  The Bracero program began

in 1942 and lasted until 1964, twelve years after the enactment of the INA; it appears that,

throughout those twelve years, the program's operation was independent of the INA.  In

any event, the Bracero program's strictures did not apply generally to guest workers, only

to workers entering under the Bracero program.

Congress declined to renew the Bracero program when it expired at the end of

1964, and so the Department of Labor promulgated regulations to govern the migration of

temporary agricultural workers into the United States.  29 Fed. Reg. 19101 (Dec. 30,

1964).  These regulations—the forerunners of those governing the modern H-2A

---

[12] As now, the H-1 program applied to workers with special skills, the H-2 program applied to unskilled workers, and the H-3 program applied to trainees.

program—carried forward the Bracero requirement that employers pay point-of-hire transportation costs. *Id.* at 19102. These regulations did not apply to non-agricultural guest workers, as their entire purpose was to fill the gap with respect to agricultural workers left by the expiration of the Bracero program. *Id.* at 19101 ("Expiration of [the Bacero program] on December 31, 1964, thereby indicating a Congressional intent to end reliance on Mexican Braceros for agricultural work in the United States, requires regulations effecting an orderly transition to the use of United States workers in areas where reliance has previously been placed upon foreign workers.").

Meanwhile, no later than 1960, the Department of Labor began taking the position that point-of-hire travel costs were "primarily for the benefit or convenience of the employer" for purposes of the FLSA. Wage & Hour Div. Op. Ltr., 1969 DOLWH LEXIS 18 (Feb. 4, 1969) (referencing similar opinion letter of May 11, 1960). In these initial opinion letters, the issue arose in the context of workers hired in the continental United States to perform labor in remote locations. In 1990, the Department of Labor expressly applied its interpretation of the FLSA in the context of foreign guest workers. Wage & Hour Div. Op. Ltr., WH-92, 1990 DOLWH LEXIS 1 (Jun. 27, 1990) (hereinafter "1990 Op. Ltr."). Given that the Department of Labor made its opinion public by issuing formal, binding opinion letters, it would seem proper to assume that Congress was aware no later than 1960 that the FLSA was thought to regulate point-of-hire transportation. *See Traynor v. Turnage*, 485 U.S. 535, 546 (1988) (noting that courts generally assume that

-13-

Congress is aware of how an agency interprets the statutes its has responsibility for

implementing).

What PLANET takes from this history is the sense that Congress (and the

Department of Labor) intended to regulate point-of-hire transportation for H-2 workers

only through the INA and related regulations, and not through the FLSA.[13]  This

argument seems to be akin to the one that prevailed in *Food & Drug Admin. v. Brown &*

*Williamson Tobacco Corp.*, 529 U.S. 120 (2000), in which the Supreme Court concluded

that, though the language of the Food and Drug Act might seem to support Food and

Drug Administration regulation of tobacco products, the history of parallel tobacco

legislation established that Congress in fact did not intend for the Food and Drug Act to

apply to tobacco.  *Id.* at 143–59.  Here, such an argument is inapt.  In the face of the

Department of Labor's longstanding opinion that point-of-hire travel is primarily for the

benefit of the employer under the FLSA (which pre-dated *any* INA regulation of point-of-

hire transportation), neither Congress nor the Department of Labor has undertaken to

address transportation costs in the context of non-agricultural guest workers through the

INA.  If anything is to be drawn from this history, it is that neither the legislative branch

nor the executive branch has seen fit to overrule the longstanding interpretation of the

FLSA in the H-2B context.  Therefore, the history PLANET relates is not persuasive that

_____

[13]  PLANET sums up its reading as follows: "Read together and in the context of their
legislative and regulatory histories, it is clear that both Congress and DOL defined an employer's
liability for the[] guestworker expenses [at issue here] under the INA and did not intend to
change those definitions by the judicial expansion of  the FLSA which  the Plaintiffs here urge."
PLANET Br. at 13–14.

the INA should be read as having any bearing on whether or how the FLSA is to apply in the matter at hand.

In sum, reading one statute as implicitly repealing a portion of another is disfavored, and, for the foregoing reasons, Brickman has not presented any compelling reason to embark on that course. Therefore, I conclude that the INA is no impediment to applying the FLSA in this case.

**B.      The impact of the Portal-to-Portal Act**

In *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), the Supreme Court held that "the statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Id.* at 690–91. Accordingly, the time employees spent walking from the employer's time clock to their workstations had to be taken into account for purposes of calculating the employees' FLSA wage rates. The effect of this holding was to force low-wage employers to compensate employees for the time they spent doing preliminary and postliminary activities on the employer's premises.

Congress superseded the decision by passing an FLSA amendment known as the Portal-to-Portal Act. Under that statute:

> no employer shall be subject to any liability or punishment under the Fair
> Labor Standards Act of 1938 . . . on account of the failure of such employer
> to pay an employee minimum wages, or to pay an employee overtime
> compensation, for or on account of any of the following activities of such
> employee engaged in on or after May 14, 1947—
>         (1) walking, riding, or traveling to and from the actual place of

-15-

> performance of the principal activity or activities which such
> employee is employed to perform, and
> (2) activities which are preliminary to or postliminary to said
> principal activity or activities,
> which occur either prior to the time on any particular workday at which
> such employee commences, or subsequent to the time on any particular
> workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).  Thus, the Portal-to-Portal Act has eliminated the *Mt. Clemens Pottery* requirement that the time spent doing necessary preliminary and postliminary activities on the employer's premises be included in the workweek for purposes of determining an employee's FLSA wage rate.

Brickman argues that the Portal-to-Portal Act similarly eliminates any obligation to reimburse an employee for preliminary costs incurred off-premises.[14]  But this reading ignores the fact that the Portal-to-Portal Act addresses payment for time, not payment for incurring expenses.  Indeed, the case Brickman primarily relies on, *Vega v. Gasper*, 36 F.3d 417 (5th Cir. 1994), specifically addressed whether employees must be paid for the time spent getting to and from work.  *Vega v. Gasper* does not address expenses, and, for that reason, both the *Arriaga* and *DeLuna* courts found it inapplicable to the question of whether expenses may be passed along to an employee.  *See Arriaga*, 305 F.3d at 1240-41; *DeLuna*, 338 F. Supp. 2d at 660.  Accordingly, I conclude that the Portal-to-Portal Act has no relevance to the issues presented in this case.

---

[14] Unlike the argument addressed in the previous section, which dealt only with transportation costs, this argument is applied to all of the costs at issue in this case.

-16-

**C.      Whether the expenses at issue here primarily benefit the employer**

Having concluded that neither the INA nor the Portal-to-Portal Act has any bearing

on this case, I turn to how the FLSA treats the three categories of expenses at issue here.

The FLSA defines "wage" to include both cash wages and "the reasonable cost . . . to the

employer of furnishing such employee with board, lodging, or other facilities, if such

board, lodging, or other facilities are customarily furnished by such employer to his

employees."  29 U.S.C. § 203(m).  In other words, when the employer pays for "board,

lodging, or other facilities," it may add the costs of those facilities to the cash wage for

purposes of complying with the FLSA minium.  The Department of Labor has stipulated

that an employer may not count as "other facilities" goods or services that are "primarily

for the benefit or convenience of the employer," 29 C.F.R. § 531.3(d)(1), and, as a

corollary, has provided that employers may not pass along to employees expenses for

such goods or services, 29 C.F.R. § 531.35.  If an employer does pass along such an

expense, then the expense is deducted from the cash wage to determine compliance with

the FLSA minimum.

The caselaw on what "primarily for the benefit of the employer" means is

surprisingly thin, and the parties, as one would expect, disagree on its interpretation.

Brickman argues that only expenses that are closely tethered to an employee's primary

work activity are included.  Thus, according to Brickman, preliminary expenses related

not to the employee's actual work, but merely to getting the employee to the worksite, are

-17-

not expenses primarily for the benefit of the employer.  Rivera, on the other hand, argues for a broader test that encompasses all costs that the employee incurs not in the ordinary course of living and working, but because of the business decisions of his particular employer.  Under this test, Rivera argues, out-of-the-ordinary expenses, such as travel from remote points-of-hire, the costs of passports and work visas, and fees to mandatory recruiters, should be deducted from cash wages to determine the FLSA wage rate.

In support of his reading, Rivera notes that several courts have read the term "other facilities" in 29 U.S.C. § 203(m) *in pari materia* with the preceding words, "board and lodging."  *See, e.g.*, *Arriaga*, 305 F.3d at 1242; *Schultz v. Hinojosa*, 432 F.2d 259, 267 (5th Cir. 1970); *Brennan v. New Jersey*, 1973 WL 1285, at *2 (D.N.J. Oct. 1, 1973); *see also* 29 C.F.R. § 531.32(a) ("'Other facilities,' as used in [29 U.S.C. § 203(m)], must be something like board or lodging.").  This comports with the textual canon of construction  *ejusdem generis*, inasmuch as the term "other facilities" is a general one that follows two more specific terms.  *See Circuit City Store, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (describing *ejusdem generis* as "the statutory canon that '[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" (*quoting* 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991))).  Rivera argues that the only things sufficiently like board and lodging to be "other facilities" are other ordinary living expenses that one would

-18-

incur wherever one worked.  According to Rivera, costs specific to the job (*e.g.*, tools of the trade) or resulting from the employer's business decisions (*e.g.*, the cost of security or other overhead) are too dissimilar to board and lodging to qualify as "other facilities."

What distinguishes Rivera's proposed interpretation from Brickman's is the business-decision category.  Brickman argues instead that expenses may be borne by the employee unless they have "an integral connection to actual job performance," that is, unless, like tools of the trade, they are specific to the job.  Brickman's Br. in Opp. to Rivera's Motion for Summary Judgment, at 17.  In making this argument, Brickman seems to borrow from the Portal-to-Portal Act's emphasis on an employee's "principal activity."  *See* 29 U.S.C. § 254(a).  Brickman contends that the Portal-to-Portal Act demonstrates that Congress did not intend for the FLSA to force employers to incur costs—in work time or in actual expenses—that are not closely tethered to the employee's "principal activity."  This reading, however, seems to put an unwarranted gloss on the Department of Labor's "primarily for the benefit of the employer" test, a test to which this court must defer.[15]  As the examples in the Department of Labor regulations show, it is possible for a cost to be "primarily for the benefit of the employer" and yet not bear a

_____

[15] The regulations at issue were promulgated by the Administrator of the Wage and Hour Division of the Department of Labor, pursuant to Congress' express delegation to him of the task of administering the FLSA.  29 U.S.C. § 204.  Thus, a court must defer to them unless they reflect an unreasonable construction of the statute (which neither party suggests).  *See Condo v. Sysco Corp.*, 1 F.3d 599, 604–05 (7th Cir. 1993) (holding that Department of Labor regulation of the FLSA was entitled to *Chevron* deference because Congress delegated to the Department of Labor the authority to interpret the FLSA); *see also Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43 (1984).

close nexus with an employee's principal job activity.  *See* 29 C.F.R. § 531.32(c).  Thus,

the regulations state that an employer may not pass along to employees overhead costs,

such as the cost of on-site security, worker's compensation, taxes, or building

construction.  *Id.*  Yet these costs may have little to do with an employee's principal

activity.  Therefore, Brickman's attempt to transpose a Portal-to-Portal Act

concept—"principal activity"—into the FLSA's "primarily for the benefit of the

employer" test is not well taken.

Rivera's argument, on the other hand, seems more faithful to the test. The

regulations deem the following goods and services "other facilities"—and hence

permitted to be passed along to the employee—for FSLA purposes:

> Meals furnished at company restaurants or cafeterias or by hospitals, hotels,
> or restaurants to their employees; meals, dormitory rooms, and tuition
> furnished by a college to its student employees; housing furnished for
> dwelling purposes; general merchandise furnished at company stores and
> commissaries (including articles of food, clothing, and household effects);
> fuel (including coal, kerosene, firewood, and lumber slabs), electricity,
> water, and gas furnished for the noncommercial personal use of the
> employee; transportation furnished employees between their homes and
> work where the travel time does not constitute hours worked compensable
> under the Act and the transportation is not an incident of and necessary to
> the employment.

29 C.F.R. § 531.32(a).  All of these items appear to be ordinary living expenses—that is,

things that one would purchase no matter where one worked.  The regulations list the

following items as not qualifying as "other facilities"—and hence not permitted to be

passed along to employees—under the FLSA:

-20-

Safety caps, explosives, and miners' lamps (in the mining industry); electric
power (used for commercial production in the interest of the employer);
company police and guard protection; taxes and insurance on the
employer's buildings which are not used for lodgings furnished to the
employee; "dues" to chambers of commerce and other organizations used,
for example, to repay subsidies given to the employer to locate his factory
in a particular community; transportation charges where such transportation
is an incident of and necessary to the employment (as in the case of
maintenance-of-way employees of a railroad); charges for rental of
uniforms where the nature of the business requires the employee to wear a
uniform; medical services and hospitalization which the employer is bound
to furnish under workmen's compensation acts, or similar Federal, State, or
local law.

29 C.F.R. § 531.32(c).  These costs are uniformly not ordinary living expenses, but rather

appear to be specific either to the job (like tools) or to the employer (like company

security).  Thus, Rivera's contended-for dividing line between ordinary living expenses

on the one hand, and costs specific to the job or deriving from the employer's particular

business decisions, seems to work as a means of explaining the regulations' examples.  At

the same time, it is important to remember that "primarily for the employer's benefit" is

the test the regulations prescribe.  Accordingly, Rivera's dividing line, while useful,

cannot be permitted to stray from that test.

Having discussed in the abstract the standard for determining whether an employer

may pass along an expense to its employees, I will now turn to the specific costs at issue

here.

      1.     **Transportation costs**

The transportation costs at issue are the workers' expenses traveling to the

Brickman worksites (where they then lived for up to ten-and-a-half months) from their home countries, and, once the work season concluded, back to their home countries from the Brickman worksites.  The costs do not include any expenses related to daily commuting to and from the worksites.

Under applicable Department of Labor regulations, ordinary commuting is not primarily for the benefit of the employer for FLSA purposes.  29 C.F.R. § 531.32(a) & (c); *see also Arriaga*, 305 F.3d at 1241.  Moreover, the regulations provide that transportation is primarily for the employer's benefit when it is "incident of and necessary to the employment."  29 C.F.R. § 531.32(c).  As one would expect, daily commuting is the analogy to this case that Brickman believes is most apt.  It argues that, in contrast to transportation that is part of one's principal working activity—*e.g.*, for a rail-track inspector, travel along the rail lines—plaintiffs' transportation is, like everyday commuting, merely preliminary transportation to the worksite that every employee expects to undertake.  Rivera, on the other hand, argues that transportation from a remote point-of-hire is unlike ordinary communing inasmuch as it (1) is not the sort of cost the typical worker expects to incur in ordinary life, and (2) derives from the employer's decision to recruit workers from outside the United States.  Moreover, though it may bear little nexus to the employee's principal job activity, Rivera argues that initial transportation to the worksite is an "incident of and necessary to the employment" because it is a necessary accompaniment to Brickman's desire for guest-worker labor, and

a necessary result of Brickman's representation that suitable local labor could not be found.

For many years, the Department of Labor agreed that transportation to and from the point of hire was primarily for the benefit of the employer.  Accordingly, the Department of Labor issued a series of opinion letters that reflected this interpretation. *See, e.g.*, 1990 Op. Ltr. ("Under the FLSA, it has always been the position of the Department of Labor that no deduction, that cuts into the minimum wage, may be made for transportation of workers from the point of hire and return to that point.  This is so, because such transportation costs incurred in this connection are deemed to be primarily for the benefit of the employer."); Wage & Hour Div. Op. Ltr. WH-92, 1970 WL 26461 (Nov. 10, 1970) ("We have consistently regarded the cost of transporting employees to and from the point of hire as a cost to be borne by the employer, and not the employees, as a cost incidental to the employer's recruitment program.").  In 1994, however, the Department declared a moratorium on pursuing employers who fail to pay these costs pending a reevaluation of its interpretation.  *See* Ltr. from Sec'y of Labor Robert Reich to Rep. Martin Lancaster, May 11, 1994 (hereinafter "Reich Ltr.").  Though administrative enforcement actions have ceased, the Department of Labor has not officially revised its position that travel costs from remote locations are primarily for the benefit of the employer, and, indeed, has explained in subsequent communications that its official position is unchanged.  *See* Warner Ltr.

Rivera argues that the pre-1994 opinion letters are entitled to *Auer*, or, alternatively, *Skidmore* deference.  Under *Auer v. Robbins*, 519 U.S. 452 (1997), an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation."  *Id.* at 461 (citations and internal quotation marks omitted).  Here, Rivera posits that the opinion letters it cites are interpretations of the 29 C.F.R. § 531.32 "primarily for the benefit of the employer" test, and, therefore, fall within the ambit of *Auer*.

The *DeLuna-Guerrero* court refused to rely on the opinion letters because it believed the Department of Labor's position to be too unclear.  I agree, and in so doing, I note that the Department of Labor's position is not merely unclear, but untenable.  According to its correspondence, the Department of Labor will take action against employers who (1) advance the cost of remote travel and subsequently recoup it by deducting from employees' paychecks, or (2) provide, for a fee, transportation from remote points-of-hire themselves.  *See* Warner Ltr.  But, according to the Department of Labor's own regulations, there is no difference between these situations on the one hand, and, on the other, a situation in which the employer merely requires employees to secure travel on their own and at their own expense.  *See* 29 C.F.R. § 531.35 ("Whether in cash or in facilities, 'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.'  The wage requirements of the [FLSA] will not be met where the employee 'kicks-

back' directly or indirectly to the employer or to another person for the employer's benefit

the whole or part of the wage delivered to the employee."). To enforce the transportation

cost requirement in the first scenario and not in the second is not a coherent policy. The

relevant issue under the FLSA is not the method of passing a cost along to the employee,

but whether the cost is one that may be passed along at all. Given that the Department of

Labor is bringing enforcement actions against employers who attempt to pass along the

cost of transportation from remote points-of-hire through some means, its position must

be that those costs are primarily for the employer's benefit. Still, *Auer* deference is

premised on the notion that the agency is in the best position to understand its own

regulation. Given that the agency has publicly called its own position into question, *Auer*

deference seems inappropriate.

The *Arriaga* court also considered whether to accord the opinion letters *Skidmore*

deference. Under *Skidmore*, informal agency pronouncements are accorded deference

commensurate with their persuasive value. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140

(1944) ("We consider that the rulings, interpretations and opinions of the Administrator

under [the FSLA], while not controlling upon the courts by reason of their authority, do

constitute a body of experience and informed judgment to which courts and litigants may

properly resort for guidance. The weight of such a judgment in a particular case will

depend upon the thoroughness evident in its consideration, the validity of its reasoning,

its consistency with earlier and later pronouncements, and all those factors which give it

power to persuade, if lacking power to control."). The *Arriaga* court declined to accord the opinion letters any deference because it concluded that they stated the Department's position in summary fashion and thus failed to provide any justification of persuasive value. 305 F.3d at 1239. Rivera argues that this was incorrect because, though the letters are not detailed, strength-of-analysis is but one of the considerations in deciding how much weight to accord an agency's informal statements. Another *Skidmore* consideration is the consistency of the agency's pronouncements, 323 U.S. at 140, which, according to Rivera, cuts in its favor because the Department of Labor has long maintained the position that travel to and from remote points-of-hire primarily benefits the employer. The Department of Labor's apparent reevaluation of its policy, however, undercuts Rivera's argument that the agency's position has been consistent. Indeed, as stated above, the Department's recent pronouncements reflect a high level of confusion—to the point that its enforcement policy is essentially nonsensical. Given the apparent (and now more than thirteen-year-old) incoherence at the Department of Labor with regard to this issue, I am not persuaded that I should accord the older opinion letters any significant weight.

As we do not have the benefit of any deference-worthy analysis from the Department of Labor, I turn to the caselaw. The *Arriaga* decision is the only appellate-level opinion on point. In it the Eleventh Circuit held that transportation costs to and from remote points of hire are "primarily for the benefit of the employer." 305 F.3d at

1244.  Finding prior caselaw[16] and the Department of Labor opinion letters unpersuasive, the *Arriaga* court began with the language of 29 C.F.R. § 531.32(c), which states that transportation is primarily for the benefit of the employer if it is "incident to and necessary for the employment."  *Id.* at 1242.  Consulting the dictionary definitions of "incident" and "necessary," the court reasoned that point-of-hire transportation costs are incident and necessary, inasmuch as  they are the foreseeable and unavoidable result of an employer choosing to hire immigrant guest workers (as those workers are, by definition, hired from a remote location).  *Id.*  In addition, looking at the lists in 29 C.F.R. § 531.32(a) & (c), the court concluded that expenses other than ordinary living expenses are primarily for the benefit of the employer.  *Id.*  Travel from remote points-of-hire, the court determined, are not ordinary living expenses, and thus primarily benefit the employer.  *Id.*  Other than *Arriaga*, the only published opinion directly on point is that in *DeLuna-Guerrero*, but its reasoning essentially follows that of the *Arriaga* court's.

Brickman answers these authorities with a hypothetical: consider a situation in which an employer chooses to advertise a job opening on the internet.  The employer does so because it has determined that a larger number of well qualified applicants will present themselves if the employer's recruitment efforts are not confined to the employer's metro

---

[16] Two prior district court cases, *Torreblanca v. Naas Foods, Inc.*, 1980 WL 2100 (N.D. Ind. Feb. 25, 1980), and *Brock v. Glassboro Serv. Ass'n*, 1987 WL 25334 (D.N.J. Jul. 23, 1987), *aff'd sub nom. McLaughlin v. Glassboro Serv. Ass'n*, 841 F.2d 1119 (3d Cir. 1988) (table), *cert. denied*, 488 U.S. 821 (1988), had concluded that travel to and from remote points-of-hire was primarily for the benefit of the employer.  Both primarily relied on the Department of Labor's then-clear position with little additional reasoning.

area (*i.e.*, normal commuting distance).  According to Brickman, under Rivera's reading of the FLSA, the employer would be required to reimburse those costs as necessary to bring the first week's paycheck up to the minimum wage.  Brickman (without citing cases) characterizes this result as a vast change in the settled understanding of the FLSA.

Rather than confronting Brickman's hypothetical, Rivera argues that FLSA cases are fact-dependent, and that the facts in this case compel finding that the transportation costs were primarily for Brickman's benefit.  In so arguing, Rivera emphasizes the fact that, unlike an employer generally advertising a job opening, Brickman specifically directed its recruiting efforts to workers in Mexico and Guatemala by (1) participating in the H-2B program, and (2) hiring third-party recruiters based in Mexico and Guatemala to hire potential workers.  To participate in the H-2B program, Brickman had to demonstrate to the Department of Labor that it was unable to find a sufficient number of suitable workers in the United States.  Rivera argues that, under circumstances like these, in which an employer specifically directs its recruiting to remote points-of-hire because it cannot find suitable labor in its area, transportation is an expense that primarily benefits the employer.  Indeed, assuming that Brickman and the Department of Labor correctly determined that there were not enough suitable workers in the United States, Brickman would have been unable to staff its operations had it not participated in the H-2B program and hired foreign workers.

I agree with the *Arriaga* decision that, in such circumstances, point-of-hire

transportation is primarily for the employer's benefit, both because it is dissimilar to lodging and board, and because the expense arises out of Brickman's decision actively to recruit workers in foreign countries.  Two key interrelated factual differences distinguish this case from Brickman's hypothetical.  First, the plaintiffs' relocations to the United States were, by the terms of their visas and job offers, necessarily temporary and short-term.  Second, Brickman hired recruiters to make job offers in the workers' home countries, *i.e.*, at remote points of hire. In Brickman's hypothetical, the employer merely puts out an advertisement and waits for prospective employees to approach it.  The point of hire typically remains the employer's place of business, as that is the place to which the employee must come to interview and to receive an offer of employment.  Moreover, even if the employment is time-limited, the prospect of permanent relocation is typically open.  It is possible that the cost of long-term relocation is akin to an ordinary living expense.  But relocating to another country for a short, discrete period of time is more irregular, particularly when one is recruited and hired from one's home country, and particularly when there is no possibility of making the relocation permanent. Given these factual differences, Brickman's hypothetical is not persuasive that a ruling that the FLSA applies to H-2B workers hired in their home countries would cause any difficulty for employers using more conventional means of filling their workforces.

I conclude that, in the context of this case, the cost of transportation from remote points-of-hire is "primarily for the benefit of the employer."  That means that it was not

permissible for Brickman to pass along to plaintiffs the costs of travel between the points-of-hire in the workers' home countries and the Brickman worksites to the extent that doing so reduced the plaintiffs' wages below the FLSA minimum.

### 2.   Visa-related costs

The visa-related costs at issue here are various fees associated with obtaining a valid H-2B work visas.  The *Arriaga* court also considered this issue and concluded that because the visa costs arise directly and necessarily from the employer's decision to recruit guest workers, and because visa costs are not ordinary living expenses, the visa costs are primarily for the benefit of the employer.  305 F.3d at 1244.  I agree, but to this reasoning I would add that H-2B visas only authorize their holders to work for one specified employer.  *See* Brickman's Resp. to Statement of Undisputed Facts ¶ 30.  Thus, unlike ordinary living expenses, these visas had no value to the workers other than their authorization to work *for Brickman*.  Brickman points out that H-2B visas, though issued for only one employer, may be transferred to another if the guest worker so petitions.  But to do that, the worker would need to have a transferee job in hand at the time of the petition, and the worker would not be allowed any gap between H-2B employers, since as soon as the guest worker ceases being employed by the authorized employer, he must return to his home country.

Passport costs, however, are different.  Unlike the cost of an employer-specific visa, which has but one use, a passport has more general use, and seems more like an

-30-

ordinary living expense (similar to the cost of obtaining a non-commercial driver's license).  Therefore, while I conclude that plaintiffs' expenses related to obtaining work visas were "primarily for the benefit of the employer," I exclude costs associated with obtaining passports of general use from that category.

### 3.    Workers' representatives' fees

To recruit H-2B workers, Brickman hired third-party recruiters in Mexico and Guatemala to secure for them a suitable workforce.  These recruiters found prospective employees by consulting firms that specialized in bringing together large cohorts of able-bodied workers and representing them in finding suitable foreign employment.  These firms acted as the prospective workers' representatives in connecting the workers with Brickman.  To prevent fraud, the government requires that H-2B employers designate which workers' representatives are authorized to represent their employees.  According to Brickman's paperwork and responses to Rivera's statement of undisputed facts, Brickman authorized no more than one workers' representative per country in each year.  *See* Brickman Resp. to Statement of Undisputed Facts ¶ 11.  Thus, it appears that prospective employees wishing to work for Brickman had little choice but to go through the Brickman-designated workers' representative.

These workers' representatives charged fees to Brickman's prospective employees, and plaintiffs argue that these fees were primarily for Brickman's benefit, as employees wishing to work for Brickman had no choice but to pay them.  The *Arriaga* court rejected

a similar argument on the ground that the employees had not shown that the designated recruiter was the employer's agent.  *Arriaga*, 305 F.3d at 1244–45.  In that case, however, there was no indication that going through a workers' representative was mandatory. Moreover, I do not believe that the law of agency affects the decision.  It seems, rather, that if Brickman has structured the process in such a way that a prospective employee cannot but pay a recruiting fee in order to work for Brickman, then the cost of the recruiting fee is primarily for Brickman's benefit as a cost associated with Brickman's business decision to utilize an exclusive workers' representative.  Agency law would seem as irrelevant here as it was to the questions of visa and transportation costs (in neither case did the lack of an agency relationship between the person to whom the expense was paid and the employer matter).

The real question is a factual one.  If it was the case that a worker had to go through a Brickman-designated workers' representative in order to be employed, then it would seem that any costs associated with that process were incurred primarily for Brickman's benefit.  Brickman suggests, without elaboration, that it was "theoretically possible" for a worker to avoid using the Brickman-authorized recruiter.  *See* Brickman's Resp. to Statement of Undisputed Facts ¶ 11.  But Brickman's own documents reveal just how "theoretical" this possibility was.  At the end of each season, Brickman handed out instructions to workers wishing to return the following season.  In one iteration of those instructions, the following statement appeared:

**IF YOU WANT TO RETURN TO YOUR JOB WITH BRICKMAN IN 2004 YOU WILL NEED TO CONTACT [Brickman's designated workers' representative] LLS.  PLEASE FOLLOW THE INSTRUCTIONS PRINTED ON THE BACK OF THIS PAGE.**

2003 New Instructions for Returning Workers (emphasis in original).  On the back of the

page were instructions for contacting LLS, including the following admonishment:

> ***If you do NOT report to an LLS office by January 15 to complete your paperwork, you may be replaced by another worker.***

*Id.* (emphasis in original).  These statements, made to Brickman's primary constituency

(over 90% of Brickman's seasonal workforce were returning workers), demonstrate that

Brickman directed prospective workers to its designated workers' representatives as the

prescribed means of obtaining employment with Brickman.  Similarly, Brickman

acknowledged in its response to plaintiff's statement of undisputed facts that, when

returning workers recommended hiring their acquaintances, the recommendees were

directed to contact Brickman's designated workers' representative.  Def.'s Resp. to Pl.'s

Statement of Undisputed Facts ¶ 17.  Thus, "metaphysical doubt[s]" aside, *see Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), I see no genuine

question of fact as to whether Brickman required that employees go through its

designated workers' representatives.  It is clear that Brickman did so require.

    Whether Brickman's decision to use, in each country in which it sought workers, a

single workers' representative and to filter all prospective employees through that

representative was motivated by the convenience of having the workers' paperwork handled by professionals or by the strictures of the H-2B program (or, very likely, by some combination of the two) is immaterial.  If the former, then the decision was to reduce difficulties associated with the H-2B process, and, thus, for Brickman's benefit and convenience.  If the latter, then it was a direct result of Brickman's business decision to participate in the H-2B program.  Either way, it does not qualify as an "other facility" for FLSA purposes because the workers' representatives' fees were not ordinary living expenses in any sense of the term.  Therefore, I conclude that fees associated with Brickman-designated workers' representatives are costs "primarily for the benefit of the employer," and that Brickman, therefore, was not allowed to pass those costs along to the extent that doing so reduced their wages below the FLSA minimum.

## V.    Conclusion

Plaintiffs have incurred a range of costs associated with becoming seasonal employees of the defendant Brickman Group.  That these costs were incurred is not disputed.  I have determined that plaintiffs' point-of-hire transportation costs, their visa costs, and the fees paid to workers' representatives, were primarily for Brickman's benefit.  Under this interpretation of the FLSA, Brickman acknowledges that these costs reduced plaintiffs' wages below the FLSA minimum.  As to these costs, partial summary judgment in plaintiffs' favor is warranted.  Plaintiffs' passport costs, however, were not incurred primarily for Brickman's benefit, and so summary judgment in Brickman's favor

on that issue is appropriate.  An order to this effect follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JUAN JAVIER RIVERA and JOSE
PABLO LEMUS, individually and on
behalf of others similarly situated,

                           Plaintiffs,

     v.

THE BRICKMAN GROUP, Ltd.,

                           Defendant.

Civ. No. 05-1518

**ORDER**

AND NOW, this 7th day of January, 2008, in accordance with the foregoing opinion, it is hereby ORDERED that:

1.    Brickman's motion for partial summary judgment (Docket No. 136) is GRANTED as to passport-related costs and DENIED in all other respects;

2.    Plaintiffs' motion for partial summary judgment (Docket No. 137) is DENIED as to passport-related costs and GRANTED in all other respects;

3.    the parties are ORDERED to consult with one another to determine whether, in light of this disposition, they can agree on the amount of damages that should be awarded on the FLSA claim.  The parties shall report back on this matter through a joint submission within four weeks of this order;

4.      this court's reference to Magistrate Judge Angell (Docket No. 2) for all pre-trial matters remains in effect, and the parties are encouraged to consult with her as to how the case should proceed.

BY THE COURT:

/s/ Louis H. Pollak

_____

Pollak, J.